# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:                    )
                                                   )        *17-M-052*
Cellular telephone assigned call number 414-499-2560   )
                                                   )        Case No. ~~17-M-012~~
                                                   )
                                                   )
                                                   )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to distribute a controlled substance.

The application is based on these facts: See attached affidavit.

☒ Delayed notice of _30_ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Scott Marlow, Special Agent, DEA
Printed Name and Title

Sworn to before me and signed in my presence:

Date: April 20, 2017

_____
Judge's signature

City and State: Milwaukee, Wisconsin          Honorable David E. Jones , U.S. Magistrate Judge
                                              Printed Name and Title

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Scott Marlow, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 414-499-2560 ("**Target Phone**"), whose service provider is Sprint Spectrum L.P., a wireless telephone service provider headquartered in Overland Park, Kansas. The **Target Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.       I have worked full-time as a law enforcement officer for the past twenty (20) years. I am a Special Agent for the Drug Enforcement Administration assigned to the Milwaukee District Office. I have been so employed for the past 11 years. Prior to my current employment, I was a police officer for the City of West Allis for approximately 9 years. During my duration as a law enforcement officer, I have received specialized training in identifying and investigating narcotic distribution enterprises and their related criminal activities. I have personally been involved in a number of such investigations. During my tenure with DEA, my primary investigative specialization has been in the area of urban heroin, cocaine and/or poly drug conspiracies. Presently, I am part of a team of experienced narcotics law enforcement investigators/officers, including

Special Investigators and Task Force Officers of the DEA, with experience in investigations concerning controlled substance law enforcement.

3.    I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of

2

the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

    4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

    5.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, conspiracy to possess with intent to distribute and distribution of cocaine in the form of "crack" cocaine, a Schedule II controlled substance, have been committed, are being committed, and will be committed by Charles Williams, Kenneth Roby, Jerry Walker Jr., Marshall Moody, and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations of 21 U.S.C. §§ 841(a)(1) and 846, and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

    6.    Since November of 2015, special agents from the Wisconsin Department of Justice, Division of Criminal Investigation, have been conducting an investigation

3

regarding the trafficking of large quantities of cocaine and crack cocaine in the Milwaukee area. Case agents identified the primary target in the investigation as Charles Williams, (dob: 08/18/63).

7.    In November of 2015, case agents met with a Confidential Source (CS #1) who stated that s/he purchased crack cocaine from Williams between 2004 and 2009 and had information that Williams, Kenneth Roby, and others were still distributing crack cocaine in the Milwaukee area. CS #1 stated that Williams is currently selling large quantities of crack cocaine in the Milwaukee area and CS #1 estimated that Williams is receiving 8-10 kilograms of cocaine at a time from an out of state supplier. CS #1 stated that after Williams received the cocaine, Williams or his co-conspirators cook it into crack cocaine, and then would sell the crack cocaine in 1/8 ounce quantities until the supply was exhausted. CS #1 stated that s/he is aware Williams operating a black Ford Expedition Sport Utility Truck, with license plate #340-NDY and uses this vehicle to conduct his drug trafficking operation. CS #1 further stated that several individuals were assisting Williams in selling cocaine. CS #1 stated that an individual named "Jed" (subsequently identified as Jerry Walker Jr.) works for Williams selling crack cocaine on his behalf. CS #1 stated that Walker lives one block away from Williams near 17th and North Avenue. CS #1 stated that when Walker runs out of cocaine he simply walks over to Williams' residence and obtains more cocaine. CS #1 stated that Walker operates a gold colored 4-door sedan.

4

8. CS #1 further stated that another subject named Kenneth Roby also works for Williams selling cocaine on his behalf. CS #1 stated that Roby receives 1/8 ounce quantities of cocaine from Williams. CS #1 stated that Roby recently became upset because he found out that Williams was receiving large amounts of cocaine and Williams was only giving him 1/8 ounce quantities. CS #1 further stated that s/he is also familiar with a subject named Wallace Murphy and that Murphy has purchased 1/8 of an ounce quantities of cocaine from Williams and Walker. CS #1 further stated that Williams is living with a female named Star Washington and that Washington is aware of Williams' drug trafficking. A Department of Transportation check of the license plate on the above-described Ford Expedition Sport utility truck revealed that it is listed to Star Washington, (dob: 01/17/1979) of 1313 E. Kensington Blvd., Milwaukee, Wisconsin.

9. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing information since November of 2015. Second, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including through surveillance and law enforcement reports. For example, CS #1 informed case agents of Williams' address, the vehicle Williams was using and the name of Williams' girlfriend, all of which was confirmed via surveillance and law enforcement reports. CS #1 has two 2004 felony convictions for possession with intent to deliver cocaine, a misdemeanor conviction for possession of THC, and a 1999 conviction for possession

5

with intent to deliver cocaine and a 1999 recklessly endangering safety conviction. CS #1 is serving a state revocation sentence and is cooperating for consideration regarding his current sentence. For these reasons, case agents consider CS #1 to be reliable.

10. Based upon my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant met cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded. All of the controlled buys set forth in this affidavit were audio recorded and all of the controlled buys were video recorded or were attempted to be video recorded, however, in some buys the video recorder malfunctioned.

11. In January of 2016, case agents met with a confidential source (CS #2) who stated that s/he knows Wallace Murphy personally and knows that Murphy sells crack cocaine. CS #2 further stated that through conversations with Murphy, CS #2 is aware that Murphy obtains his cocaine from Williams. For several reasons, case agents believe that CS #1 is accurate and credible. First, CS #2 has been providing information to

6

Wisconsin Department of Justice, Division of Criminal Investigation agents since 2003. Second, the information provided by CS #2 is consistent with evidence obtained elsewhere in this investigation where CS #2 was not utilized and substantial portions of CS #2's information has been corroborated through independent investigation, including through call detail records, surveillance, law enforcement reports, and other cooperating sources. For example, CS #2 informed case agents that Williams provided telephone number 414-982-0837 as the number Williams was using to sell crack cocaine, which call detail records confirmed. CS #2 has a 2006 felony conviction for felon in possession of firearm, a 2003 misdemeanor conviction for issue of worthless check, a 1999 conviction for first degree reckless injury, and a 1995 conviction for possession with intent to deliver cocaine. CS #2 is cooperating for monetary considerations. CS #2 has been cooperating as an informant in exchange for financial benefits. To date, CS #2 has received approximately $1500.00 as payment for his expenses incurred based upon his/her cooperation on this investigation. CS #2 has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, controlled buys, and other witness and law enforcement reporting. Finally, CS #2 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents consider CS #2 to be reliable.

12. On January 7, 2016, case agents conducted a controlled buy of cocaine from Murphy. Acting under the direction and control of case agents CS #2 placed a recorded

7

call to Murphy at 414-766-8133. Murphy agreed to introduce CS #2 to Williams or Williams' co-conspirators to purchase cocaine. CS #2 picked up Murphy from the area of 32nd and Mt. Vernon and Murphy directed CS #2 to travel to the area of 17th and North Avenue. Murphy indicated to CS #2, while they were en route to 17th and North, that Murphy noticed that Williams' vehicle was not parked in front of his residence so he knew that Williams was not at home. It should be noted that surveillance units also checked in front of Williams' residence and noted that the above-described Ford Expedition was not in front of the residence at that time. Murphy then directed CS #2 to go to Jerry Walker's residence to complete the purchase of cocaine.

13.     CS #2 then travelled with Murphy to 2237 North 17th Street and met with Walker. Walker stated that in order to complete the cocaine transaction he would have to travel to 12th and Capitol to obtain the cocaine. Surveillance agents observed Walker enter a gold colored 4-door sedan with no plates and case agents conducting surveillance observed CS #2 and Murphy follow Walker, who was driving his gold-colored sedan, to 1201 West Capitol Drive. Once CS #2 and Murphy arrived at 1201 West Capitol Drive, Murphy told CS #2 that this residence was occupied by "Wood," an individual CS #2 knows to be Roby. Murphy told CS #2 that Roby was selling cocaine for Williams, which was audio recorded.

14.     Murphy exited CS #2's vehicle and entered 1201 West Capitol and then returned to CS #2's vehicle and showed CS #2 a sample of the cocaine. Murphy stated that the cost of cocaine was $1250 and he (Murphy) wanted $50 for setting up the deal.

8

CS #2 agreed and gave Murphy $1300 in pre-recorded funds for the cocaine. CS #2 stated that Murphy then went back inside the residence and retrieved the cocaine. CS #2 stated that Murphy provided CS #2 with a plastic bag containing 9-corner cut bags, each of the bags containing cocaine. CS #2 then drove Murphy back to the area of 32nd and Mt. Vernon in the City of Milwaukee and Murphy exited CS #2's vehicle. CS #2 then met with agents at pre-determined location. Upon meeting with agents, CS #2 turned over a plastic bag containing an off-white substance suspected to be cocaine. Case agents subjected a sample of the suspected cocaine to the Nark II field Test and received a positive result for the presence of crack cocaine. Case agents obtained a weight of 28.1 grams with packaging materials.

15.    In the middle of January, CS #2 was contacted by Murphy, who was using phone number 414-766-8133. Murphy stated that Roby had recently called him and said that their drug supply was running low and that they [meaning Williams] were not going to replenish their supply for a few weeks. Roby indicated to Murphy that he had 21 grams of cocaine left. A few weeks later, in early February of 2016, CS #2 was contacted by Murphy who told CS #2 that Williams had replenished his supply of cocaine and was willing to sell cocaine to him directly. Murphy informed CS #2 that he (Murphy) had spoken to Williams about Williams' obtaining additional crack cocaine.

16.    On February 5, 2016, CS #2 met with case agents and placed a recorded call to Murphy at 414-766-8133. During the course of the recorded call Murphy directed CS #2 to pick him up so they could travel to Williams' residence to purchase cocaine.

9

Surveillance units followed CS #2 as CS #2 met with Murphy and observed Murphy enter CS #2's vehicle and CS #2's vehicle then traveled to Williams' residence at 2134 North 18th Street. Upon arrival at Williams' residence, Murphy attempted to call Williams utilizing CS #2's phone. During the attempts to reach Williams, CS #2 checked his/her phone and observed that the phone number Murphy utilized to call Williams was 414-982-0837 Murphy then exited CS #2's vehicle and walked up the front door of 2134 North 18th Street and after a few minutes, Murphy returned to CS #2's vehicle.

17.     After a few minutes, CS #2 observed Murphy receive a call. After completing the call, Murphy told CS #2 that Williams just called and said he (Williams) would be there in a few minutes. CS #2 stated that a few minutes later he observed a burgundy Chevy Traverse park near the front of Williams' residence. CS #2 stated that he provided Murphy with $1250 for the purchase of one ounce of crack cocaine. CS #2 stated that Muprhy exited CS #2's vehicle and Williams exited the passenger side of the Burgundy Traverse and walked up to the front door of the residence. CS #2 stated that s/he observed Murphy meet with Williams inside of the front door of Williams' residence. CS #2 stated that after Williams met with Murphy, Murphy returned to CS #2's vehicle and CS #2 stated that CS #2 then handed CS #2 a plastic bag containing the cocaine.

18.     Murphy told CS #2 that the phone number he obtained to contact Williams, 414-982-0837 was the phone number that Williams utilizes to sell cocaine. Murphy stated to CS #2 that Williams said that if he (Murphy) needed additional quantities of cocaine

10

that Murphy should call him at 414-982-0837. CS #2 then transported Murphy back to the area of 32nd and Mt. Vernon and Murphy exited CS #2's vehicle. After dropping CS #2 off, CS #2 met with agents at a pre-determined location and turned over the plastic bag he had received from Murphy, which contained an off-white substance suspected to be cocaine. Case agents subjected a sample of the suspected cocaine to the Nark II field Test and received a positive result for the presence of crack cocaine. Case agents obtained a weight of 28.0 grams with packaging materials.

19. Subpoenaed subscriber information for 414-982-0837 revealed that the subscriber is Sam Jackson, P.O. Box 15955, Lenexa, KS 66285. Based upon their training and experience and the investigation to date, case agents believe Sam Jackson to be a nominee. On February 9, 2016, case agents obtained a warrant authorizing a pen register and trap and trace for phone number 414-982-0837, which is one of the phones used by Williams. This warrant also authorized the identification of and tracking of the mobile device related to 414-982-0837.

20. On March 2, 2106, CS #2 met with case agents and placed a recorded call to Murphy at 414-766-8133 to arrange for the purchase of cocaine. During the recorded call Murphy directed CS #2 to pick him up so they could travel and meet with Williams. CS #2 was followed by surveillance units as CS #2 met with Murphy. Case agents observed Murphy enter CS #2's vehicle and surveillance units followed CS #2 as CS #2 and Murphy drove to Williams' residence at 2134 North 18th Street, Milwaukee, Wisconsin. Upon arrival Murphy exited CS #2's vehicle and walked up the front door of 2134 North

11

18th Street and entered the residence. After a few minutes, Murphy returned to CS #2's vehicle. CS #2 transported Murphy back to the area of 32nd and Mt. Vernon and Murphy exited CS #2's vehicle. After dropping CS #2 off, CS #2 met with agents at a pre-determined location and turned over a vacuum sealed plastic bag that CS #2 had received from Murphy, which contained an off-white substance suspected to be crack cocaine. Case agents subjected a sample of the suspected crack cocaine to the Nark II field Test and received a positive result for the presence of crack cocaine and case agents obtained a weight of 30.0 grams with packaging materials. Case agents reviewed the court authorized pen register on 414-982-0837 during the course of the transaction between CS #2, Murphy and Williams and observed numerous incoming and outgoing calls between 414-766-8133 (Murphy's phone) and 414-982-0837.

21.     In March of 2016, case agents met with a confidential source (CS #3) who stated that CS #3 knows Williams and Roby personally and stated that s/he is aware that Williams and Roby are good friends and that Roby was involved in selling crack cocaine and was directly supplied by Williams and selling the crack cocaine on Williams' behalf. CS #3 stated that Roby would not associate with any other drug supplier and he was loyal to Williams. CS #3 stated that Roby lived at 12th and Capitol and sold crack cocaine directly from his residence. CS #3 stated that Roby sold crack cocaine that he received from Williams in one eighth ounce quantities. CS #3 stated that the phone utilized by Roby to sell crack cocaine was 414-517-3422.

12

22. On March 15, 2016, CS #3, acting under the direction and control of case agents, placed a recorded call to Roby at phone number 414-517-3422 for the purpose of arranging a controlled buy of crack cocaine from Roby. CS #3 was able to make contact with Roby and Roby directed CS #3 to come to his residence to purchase cocaine. Case agents surveilled CS #3 as CS #3 travelled to Roby's residence at 1201 West Capitol Drive, Milwaukee, Wisconsin. CS #3 stated that Roby invited CS #3 in the kitchen area inside of the upper portion of the residence. Once inside of the kitchen, Roby asked CS #3 how much she/he wanted. CS #3 stated that s/he wanted an ounce of crack cocaine. Roby indicated that he only had "eight balls" (meaning 1/8th ounce quantities) of cocaine for sale and CS #3 told Roby that was fine. CS #3 stated at this point Roby left the room. CS #3 stated that CS #3 could hear Roby in another room and it sounded as if he was pushing buttons on a calculator. CS #3 stated when Roby came back in the kitchen he advised CS #3 that it would cost $1250 and CS #3 stated that that price was okay and gave Roby $1250 in pre-recorded funds. Roby then gave CS #3 a plastic bag containing ten smaller plastic bags each containing an off-white, chunky rocklike substance suspected to be crack cocaine. CS #3 left the residence and met with agents at a pre-determined location and CS #3 turned over the plastic bag that CS #3 had received from Roby, which contained an off-white substance suspected to be crack cocaine. Case agents subjected a sample of the suspected crack cocaine to the Nark II field Test and received a positive result for the presence of crack cocaine and case agents obtained a weight of 30.0 grams with packaging materials.

13

23.     After meeting with CS #3, case agents returned to 1201 West Capitol Drive, Roby's residence, to conduct surveillance after the above-described controlled buy had occurred. Prior to agents' arrival, case agents conducted a check of a court ordered GPS unit on Williams' vehicle. The check of GPS data revealed that Williams' vehicle was travelling towards Roby's residence after the above-described controlled buy had occurred. Upon arriving at the residence after the completion of the controlled buy, case agents observed Williams' vehicle parked directly across the street from Roby's residence. Minutes after arriving at the residence, agents observed Williams, Roby and an unidentified black male leave Roby's residence at 1201 West Capitol, Milwaukee, Wisconsin. Case agents observed Williams and the unknown black male enter Williams' vehicle and drove away and Roby then went back inside of his residence.

24.     Case agents then reviewed the court-ordered pen register on phone number 414-982-0837. The pen register revealed that Williams received two incoming calls and made one outgoing call to phone number 414-274-9896 six minutes after CS #3 left his residence.      It should be noted that Williams and the unknown male arrived approximately 11 minutes after making the call to 414-274-9896, which is believed to be Roby's phone number. Based upon their training and experience and the investigation to date, case agents believe that Williams arrived at Roby's residence after the controlled buy of crack cocaine to CS #3 to either replenish Roby's supply of crack cocaine or to pick up money from the controlled buy of crack cocaine to CS #3.

14

25.     Case agents also conducted a utility check of 1201 West Capitol Drive (lower unit). The utility check revealed this unit is listed to Kenneth Roby with the phone number of 414-274-9896. Utilities indicated that Roby has been living at this location since April of 2014.  Case agents obtained a warrant authorizing a pen register and trap and trace for phone number 414-274-9896, which case agents believe is the phone primarily used by Roby.  This warrant also authorized the identification of and tracking of the mobile device related to for 414-274-9896.

26.     Case agents conducted a check with utilities regarding Marshall Moody's home address at 3217 West Clybourn Street, Milwaukee, Wisconsin.  The utility check revealed Moody held an account at this location and provided the phone number **414-499-2560 (Target Phone)**.  Case agents conducted a check of open sources, including social media accounts, which revealed this phone number was connected to the Facebook account "iammistamoody."  Case agents also conducted a check of a public Instagram feed between Moody's account and subject named Fred Whitmoore. The Instagram feed included a communication from "iammistamoody" stating "Fred this is Charlie give me a call at 414-315-3031."  Case agents suspect that Williams was using Moody's Instagram account to contact Whitmore.

27.     In March of 2016 case agents received subscriber and toll information regarding phone number **414-499-2560 (Target Phone)** via an administrative subpoena. The subpoena information indicated that **414-499-2560 (Target Phone)** was subscribed to Marshall Moody at 3217 West Clybourn Street, Milwaukee, WI, 53208 and the account

15

has been active since September of 2014. Case agents also obtained phone tolls for phone number 414-315-3031 via administrative subpoena, which revealed that this phone number is subscribed to Charles E. Williams of 1313 E. Kensington Blvd., Shorewood, WI. On April 27, 2016, case agents obtained a state court order authorizing the installation of a pen register/trap and trace with call location data for phone number 414-315-3031. Case agents examined the pen register information for phone number 414-315-3031, which revealed the following between April 27, 2016 and August 23, 3016: 980 phone calls were made between phone number 414-315-3031 and 414-405-9180 (Star Washington), and 504 calls were made between 414-315-3031 and **414-499-2560 (Target Phone)**.

28.     In early May of 2016, case agents were contacted by CS #2 regarding Williams and Moody. CS #2 stated that s/he was familiar with a subject named "Ricky" (subsequently identified as Ricky Semons). CS #2 stated that Semons lives in the area of 42nd and Hampton (believed to be 4130 West Hampton) and stated that Semons operates a drug house and he sells crack cocaine. CS #2 stated that Semons hides his crack cocaine outside of the residence. CS #2 stated that Semons' phone number is 414-484-7436. CS #2 stated that Semons is familiar with Williams and that Semons has been to Williams' residence at 2134 North 18th Street on numerous occasions. CS #2 stated that Semons knows that Williams is involved in selling crack cocaine and is associated with a subject named "Marshall" (believed to be Marshall Moody). CS #2 stated that Semons told CS #2 that Moody is "the man," and Semons told CS #2 that CS #2 should deal directly with Moody. CS #2 stated that CS #2 interpreted Semons' comments to mean that Moody is

16

in charge of the crack cocaine trafficking operation with Williams. Semons told CS #2 that Moody supplies him (Semons) with crack cocaine. CS #2 believes that Semons gets several ounces of crack cocaine from Moody at a time. CS #2 stated that Semons offered to introduce CS #2 to Moody and Semons stated that he would facilitate the sale of crack cocaine between CS #2 and Moody.

29. In early May of 2016, CS #3 told case agents that s/he had spoken with Roby over the telephone and that Roby stated that he was currently out of crack cocaine and that he was waiting on Williams to receive a new shipment of cocaine so Williams could re-supply him. CS #3 stated that Roby told CS #3 that Williams should be receiving the shipment of cocaine in one or two days.

30. On May 13, 2016, CS #2, acting under the direction and control of law enforcement, placed a series of recorded calls to Williams at phone number 414-982-0837 to arrange for the purchase of crack cocaine, however, he was unable to reach Williams. Later, CS #2 stated that s/he went to Williams' residence at 2134 North 18th Street and during the course of the meeting Williams provided CS #2 with his phone number 414-982-0837 and Williams agreed to provide CS #2 with crack cocaine in the future.

31. On May 16, 2016, acting under the direction and control of case agents, CS #2 placed a recorded call to Williams at phone number 414-982-0837. During the course of the call, Williams directed CS #2 to meet him in the area of 15th and North Avenue to conduct the purchase of crack cocaine. Upon CS #2 arriving in the area of 15th and North Avenue, Williams directed Walker to meet with CS #2 at CS #2's vehicle. Walker entered

17

CS #2's vehicle and gave CS #2 a plastic bag containing crack cocaine and CS #2 provided Walker \$2200 in pre-recorded funds. After the transaction was completed CS #2 transported Walker to 2134 North 18th Street. Upon completion of the controlled buy, CS #2 met with case agents at a pre-determined location and CS #2 turned over the suspected crack cocaine to case agents. Case agents subjected a sample of the suspected crack cocaine to the Nark II Field Test and received a positive test for the presence of crack cocaine and case agents weighed the crack cocaine and the substance weighed more than 58.1 grams with packaging materials.

32.    In June of 2016 case agents received phone record information regarding **414-499-2560 (Target Phone)** via administrative subpoena, which revealed that for the period of April 7, 2016 through June 5, 2016 there were 55 calls between **414-499-2560 (Target Phone)** and phone number 414-484-7436 and 255 calls between phone numbers 414-315-3031 (Williams' phone) and **414-499-2560 (Target Phone)**. Additionally, phone records revealed that phone number 414-315-3031 (Williams' phone) was the third most frequent caller on phone **414-499-2560 (Target Phone)** during that time period.

33.    On July 9, 2016, CS #2 stated that s/he had been in contact with a customer of Moody's who told CS #2 that Williams and Moody had travelled to California to replenish their cocaine supply. Moody's crack cocaine customer further told CS #2 that Moody and Williams travelled to California with several individuals to give the appearance that they were on a family vacation and stated that Williams and Moody were picking up several kilograms of cocaine. On July 10, 2016 CS #2 received a text message

18

from Williams on phone number 414-982-0837 stating "Monday." CS #2 stated that s/he believed this text to mean Williams would be back from California on July 11, 2016.

34.    An examination of call location data obtained pursuant to a state court order for phone number **414-499-2560 (Target Phone)** and 414-982-0837 (Williams' phone) revealed that between July 6, 2016 and July 10, 2016, the phones were in the Inglewood, California area.    On July 11, 2016, an examination of phone location information of 414-982-0837 (Williams' phone) and **414-499-2560 (Target Phone)** revealed that the phones were back in Wisconsin at approximately 12:00 p.m.

35.    On July 12, 2016, acting under the direction and control of case agents, CS #2 met with Williams at 2134 North 18th Street.  CS #2 stated that Williams showed CS #2 approximately one ounce of crack cocaine and told CS #2 he has anything that CS #2 wants and that he was ready to conduct business.  This meeting was audio recorded.

36.    On July 12, 2016, case agents made contact with representatives of Mayfair Rent-A-Car in Waukesha, Wisconsin.  Subpoenaed records reveal that Keesha Fulsom rented a 15-passenger van for the time period of July 6, 2016 to July 11, 2016. The representative stated that Marshall Moody was listed as a secondary driver on Fulsom's contract. Mayfair Rent-A-Car indicated that Fulsom stated that she was travelling to Disneyland in California for vacation. Representatives from Mayfair Rent-A-Car further indicated that they were very familiar with Star Washington and stated that Star Washington had rented vans from their company on 11 previous occasions and

19

Washington stated that she was travelling south. On each trip Washington rented a 15-passenger van.

37. On July 15, 2016, acting under the direction and control of case agents, CS #2 placed a series of recorded phone calls to Williams at 414-982-0837 to arrange a controlled buy of crack cocaine from Williams. CS #2 made contact with Williams and he agreed to provide CS #2 with crack cocaine and directed CS #2 to go to the area of 15th and North to complete the transaction. When CS #2 arrived in the area of 15th and North Avenue, Walker arrived and entered CS #2's vehicle to complete the crack cocaine transaction on Williams' behalf. Walker then directed CS #2 to Walker's residence in the 2200 block of North 17th Street. Upon arrival at Walker's residence, CS #2 stated that Walker pulled out a plastic bag containing approximately 4 ½ ounces of cocaine, which was not what CS #2 had requested from Williams. CS #2 had requested that the deal be for two ounces of crack cocaine, which is what the previous deal had involved. Walker realized that he had the wrong amount of crack cocaine and CS #2 then contacted Williams who directed CS #2 and Walker to come to Williams' residence at 2134 North 18th Street.

38. Upon arrival at Williams' residence, CS #2 and Walker met with Williams inside the residence. During the meeting with Williams, Williams gave CS #2 approximately 2 ounces of crack cocaine and CS #2 paid Williams $1100 for one ounce of crack cocaine. Williams stated that CS #2 could pay him for the second ounce of crack cocaine at a later date. After the controlled buy was completed, CS #2 met with case

20

agents at a pre-determined location and CS #2 turned over the suspected crack cocaine to case agents and case agents subjected a sample of the suspected crack cocaine to the Nark II Field Test and received a positive test for the presence of crack cocaine. Your affiant weighed the cocaine and the substance weighed more than 50 grams with packaging materials.

39.     On August 26, 2016, the Honorable Nancy Joseph, United States Magistrate Judge for the Eastern District of Wisconsin signed a warrant authorizing case agents to obtain location information regarding phone number 414-499-2560 **(Target Phone)**, used by Williams. The monitoring period expired on October 10, 2016.

40.     Since that time, case agents have monitored the location information for the **Target Phone** and case agents were able to determine that the phone was frequently in the area of 8419 West McMyron West Allis, Wisconsin, which was subsequently identified as Keesha Fulsom's residence, Moody's girlfriend. The location information for the phone further revealed that the phone was frequently in the area of 32nd and Clybourn and 20th and Burleigh, and it was subsequently determined that Moody owns property at these locations.

41.     On September 16, 2016, the location information for the **Target Phone** revealed that the phone had travelled out of the state of Wisconsin and appeared to be travelling west. Case agents also had court-ordered authorization to monitor the location information for Charles Williams' phone, 414-982-0837, at that time, and both phones appeared to be travelling together. On September 18, 2016, the location information for

21

both phones arrived in the California area. Case agents were able to determine that the location information for both the **Target Phone** and Williams' phone stopped in the El Segundo, California area.

42. On September 19, 2016, case agents interviewed representatives at the Mayfair Rent-A-Car who provided information regarding a suspected vehicle that Moody and Williams may have used to travel from Milwaukee to El Segundo, California.

43. Representatives from Mayfair Rent-A-Car stated that Andre Thompson (dob: 10/10/1981), who resides at 455 N. 39th St., Milwaukee, WI rented a 2016 Ford Transit Van with WI LIC# 124-WLK, with an additional driver listed as Lawrence Thompson (dob: 5/1/1985), and listed an address of 2134 N. 18th St., Milwaukee, WI, which is Williams' residence. The vehicle was rented on September 15, 2016 and the vehicle was due to be returned on September 19, 2016 and was overdue.

44. On September 20, 2016, the **Target Phone** and Williams' phone returned to the Milwaukee area and travelled directly to the residence at 1309 S. 60th Street. Case agents conducting surveillance observed the 2016 Ford Transit Van with WI LIC# 124-WLK arrive in the parking lot of 1309 S. 60th Street. Case agents further observed Moody exit the transit van with a duffle bag and enter the residence and observed the same person then exit the residence carrying a plastic Target store bag.

45. On October 13, 2016, the Honorable David E. Jones, United States Magistrate Judge for the Eastern District of Wisconsin signed a warrant authorizing case

22

agents to obtain location information regarding the **Target Phone**, used by Moody for a period of 45 days. That monitoring period expired on November 27, 2016.

46. Since October 13, 2016, case agents have monitored the location information for the **Target Phone**. The location information for the **Target Phone** revealed that it travelled to the Baltimore, Maryland area on October 28, 2016 returning on October 31, 2016. Based upon their training and experience and the investigation to date, including the fact that case agents have identified a pattern of Moody and Williams traveling out of town approximately every two months to obtain cocaine as well as the fact that the **Target Phone** travelled directly back to Wisconsin from Maryland, case agents believe that Moody travelled to the Baltimore, Maryland area was related to Moody's drug-trafficking.

47. On November 2, 2016, acting under the direction and control of case agents, CS #2 called Williams on phone number 414-982-0837 and arranged to purchase two-ounces of crack cocaine from Williams. Later that day, CS #2 travelled to the area of 14th and North Avenue to purchase the crack cocaine from Williams. The deal occurred in the parking lot of the Rainbow Foods store and case agents observed Williams arrive at the location along with two other unidentified black males. Case agents observed that when CS #2 arrived Williams and the other two unidentified black males exit their vehicle. CS #2 recognized one of the black males with Williams, however, CS #2 stated that Williams then directed the other unidentified black male to provide the crack cocaine to CS #2 and he subsequently delivered the crack cocaine to CS #2 in CS #2's vehicle. CS

23

#2 received two ounces of crack cocaine and one ounce of crack cocaine was fronted by Williams. Williams called CS #2 after the transaction on 414-982-0837 and arranged for the future payment for the second ounce of crack cocaine that CS #2 received on November 2, 2016. After conducting the transaction with CS #2, Williams indicated to CS #2 that he had additional cocaine for him to purchase when he was ready.

48.     During the course of the controlled purchase of crack cocaine on November 2, 2016, case agents conducting surveillance were able to observe Williams meet with an individual in a burgundy pickup truck at his residence prior to the purchase of crack cocaine by CS #2. The burgundy pickup truck has previously been identified as being associated with Moody by CS #2 and CS #4 and case agents believe Williams was meeting with Moody prior to the transaction with CS #2.

49.     On Friday, November 18, 2016, acting under the direction and control of case agents, CS #2 conducted a controlled payment for the fronted ounce of crack cocaine CS #2 received on November 2, 2016. CS #2 met with Williams and paid him $1100 for the fronted ounce of cocaine. CS #2 stated that during the meeting, CS #2 asked Williams if he would have crack cocaine for sale during the first of the month [December] and Williams indicated that he would have crack cocaine for sale whenever CS #2 is ready.

50.     On November 30, 2016, the Honorable Nancy Joseph, United States Magistrate Judge for the Eastern District of Wisconsin signed a warrant authorizing case agents to obtain location information regarding the **Target Phone**, used by Moody for a period of 45 days. That monitoring period expired on January 14, 2017.

24

51.     Since November 30, 2016, case agents have monitored the location information for the **Target Phone**. The location information for the **Target Phone** revealed that it made frequent stops in the area of 32nd and Clybourn and 20th and Burleigh. Moody owns rental properties in these areas; however, case agents have not yet determined whether these rental properties are used as stash houses. Additionally, the **Target Phone** also made frequent stops at Williams' residences located at 2134 North 18th Street and in the area of 1309 S. 60th Street, West Allis.

52.     In late November of 2016, case agents spoke with CS #2 and CS #2 stated s/he is in contact with Ricky Semons and that Semons obtains distribution-level quantities of crack cocaine from Moody. According to CS #2, Semons told him/her that Moody was currently in possession of a large quantity of cocaine. Semons stated that the cocaine that Moody has is poor in quality but he is still selling it.

53.     On January 2, 2017, case agents interviewed a new source of information (hereinafter SOI or CS #5). The SOI stated that s/he grew up with Charles E. Williams and has known him for 20 years. The SOI stated that Williams travels to California pick up cocaine once a month and that Williams has been conducting these trips since 2013. The SOI further stated that on one occasion s/he has seen approximately 2 ½ kilograms of cocaine at Williams' residence located at 2134 North 18th Street, Milwaukee, WI. The SOI stated that Williams' partner in the cocaine business is Marshall Moody. The SOI further stated that Williams and Moody travel to California to pick up the cocaine and Williams and Moody split the cocaine they purchase in California for distribution in the

25

Milwaukee metropolitan area. The SOI further stated that Moody operates a tan Chevrolet Monte Carlo.

54. On January 18, 2017, the Honorable Nancy Joseph, United States Magistrate Judge for the Eastern District of Wisconsin signed a warrant authorizing case agents to obtain location information regarding the **Target Phone**, used by Moody, for an additional period of 45 days. That monitoring period expired on March 4, 2017.

55. Since January 18, 2017, case agents have monitored the location information for the **Target Phone**. The location information for the **Target Phone** revealed that it made frequent stops in the area of 32nd and Clybourn and 20th and Burleigh. Moody owns rental properties in these areas; however, case agents have not yet determined whether these rental properties are used as stash houses. Additionally, the **Target Phone** also made frequent stops at Williams' residences located at 2134 North 18th Street and in the area of 1309 S. 60th Street, West Allis. Case agents were also able to identify another residence located at 5th and Hadley based upon the location information received for the **Target Phone**. The location information for the **Target Phone** has revealed that Moody travelled to this residence, which appeared to be owned by Parlee Moody, on an almost daily basis for the past 45 days. Based upon their training and experience and the investigation to date, case agents suspect this to be another stash location utilized by Moody, however, case agents have not yet determined whether this location is a stash house.

26

56. On January 6, 2017, case agents interviewed CS #5 and CS #5 stated that earlier that day CS #5 had met with Walker. CS #5 stated that Walker is upset with Williams because Williams' brother, John Williams, shot him. Walker also told CS #5 information about how Williams' current drug operation. Walker told CS #5 that Williams and Moody travel to California to pick up cocaine and that Moody and Williams each put in $100,000 in cash to purchase the cocaine. Walker stated that each of them purchase 5 kilograms of cocaine and their supplier "fronts" them each 5 kilograms of cocaine for a total of 20 kilograms each trip. Walker stated that when they return from California, Williams and Moody split the cocaine and Williams stores the cocaine at a residence in the area of 60th and National (believed to be 1309 S. 60th Street). Walker stated that he has been inside of Williams' residence at 60th and National and that it is located above a bar. Walker stated that Williams is friends with the owner of the bar and there are video cameras all over the property so Williams can monitor the apartment. Walker told CS #5 that Williams keeps the cocaine inside of a closet in the apartment along with money from his drug sales. Walker stated that the money and drugs are inside of suitcases and hidden among his clothing. Walker estimated that Williams has over $300,000 inside of the residence on 60th and National (1309 S. 60th Street). Walker further informed CS #5 that Williams is currently on disability due to being shot several times. Walker told CS #5 that Charles does not spend his disability checks and that he could have over $100,000 in his bank account.

27

57.     For several reasons, case agents believe that CS #5 is reliable and credible. First, CS #5 has been providing information since January of 2017. Second, the information provided by CS #5 is consistent with evidence obtained elsewhere in this investigation where CS #5 was not utilized, and substantial portions of CS #5's information has been corroborated through independent investigation, including through surveillance and law enforcement reports. CS #5 has two state felony drug convictions and one federal drug conviction for conspiracy to distribute 5 grams or more of cocaine base. CS #5 has been cooperating as an informant in exchange for financial benefits. To date, CS #5 has received approximately $70.00 as payment for his expenses incurred based upon his/her cooperation on this investigation.

58.     On January 20, 2017, acting under the direction and control of case agents and provided with a covert audio and video recording device, CS #5 traveled to 2134 North 18th Street, a known "stash" house utilized by Williams. CS #5 stated that during the meeting CS #5 observed Williams and Moody inside of the residence as well as a black male who he only knows by the nickname of "Pete," and another black male who operates a gold Mercedes that was parked in front of the residence (believed to Gregory Washington). CS #5 stated that s/he asked Williams if the s/he could return later and purchase cocaine. Williams responded that he was totally out. CS #5 stated that in the past when Williams was out of cocaine he would leave town shortly thereafter to obtain additional cocaine. Case agents also observed the gray colored Nissan bearing IL plate V78-4993, used during the January 9, 2017 controlled purchase, parked in front of the

28

residence and observed Williams, Moody, and "Pete" enter the Nissan with IL plates and leave the area.

59. On February 14, 2017, case agents were contacted by CS #2 regarding Charles Williams. CS #2 stated that s/he received a text message from phone number 414-484-3091 that stated "Hey that me 18st." CS #2 indicated s/he placed a return call to the phone number and Williams answered the phone. CS #2 asked Williams if this was his new phone number and he said that it was. It should be noted that Williams' previous phone number was 414-982-0837.

60. On Friday, February 28, 2017, acting under the direction and control of case agents, CS #2 conducted a controlled payment for a fronted ounce of crack cocaine CS #2 received from Williams on February 8, 2017. CS #2 contacted Williams via text message on 414-484-3031. Williams asked CS #2 to meet him at his residence (2134 North 18th Street) to make payment. CS #2 met with Williams at Williams' residence and paid him $1100 for the fronted ounce of cocaine. CS #2 stated that during the meeting Williams stated that he was having trouble with his family and that was one of the reasons that he changed his phone number. Williams further stated that one of his nephews was killed in a gang-related shootout. CS #2 stated as he was walking out of the residence on North 18th Street, s/he observed Moody exit a black pick-up truck and walk inside of the residence. After meeting with CS #2 case agents returned to the residence at 2134 North 18th Street and observed a black pick-up truck bearing WI plate LV2335 parked near the front door of the residence. Case agents conducted a check with the Wisconsin

29

Department of Transportation which revealed Wisconsin plate # LV2355 was listed to a 1997 Chevrolet black pick-up truck. The vehicle was registered to Marshall Moody, DOB: 09/04/1973 of 2012 West Burleigh Street, Milwaukee, WI 53206. Case agents conducted a check of pen register records related to the **Target Phone** which revealed two incoming text messages and one outgoing text message to phone number 414-249-8507 prior CS #2 arriving and as CS #2 was leaving the residence. Case agents suspect that 414-249-8507 is a second phone utilized by Williams.

61. On March 6, 2017, the Honorable David E. Jones, United States Magistrate Judge for the Eastern District of Wisconsin signed a warrant authorizing case agents to obtain location information regarding the **Target Phone**, used by Moody, for an additional period of 45 days. That monitoring period will expire on April 20, 2017.

62. On March 26, 2017, acting under the direction and control of case agents, CS #2 went to Charles Williams' address located at 2134 North 18th Street to discuss future purchases of crack cocaine. CS #2 indicated that s/he went to the residence located at 2134 North 18th Street and that s/he met with Williams. CS #2 stated that once inside of the residence CS #2 observed a light skinned black male in the living room area. CS #2 stated that the s/he could see the butt of a handgun protruding out of his front pants pocket. CS #2 stated that the s/he was able to engage in conversation with Williams. CS #2 stated Williams told CS #2 that he would be able to sell him/her 9 ounces of crack cocaine in the future but currently he only had a couple of ounces left for sale. Williams indicated that the cost would be $10,500, Williams indicated that he would have more

30

information for CS #2 later that night. CS #2 stated that just prior to him/her leaving the residence the light skinned black male told Williams "I will see you later unc." CS #2 suspected that this subject could be one of Williams' nephews.

63.     On March 30, 2017, acting under the direction and control of case agents, CS #2 placed a recorded call to Williams at the **Target Phone** to arrange for the future purchase of cocaine base. CS #2 was able to make contact with Williams and he indicated that he did not have anything right now and it is currently a "waiting game." Williams indicated to CS #2 that he thought he would have something for CS #2 this week. Williams indicated to the CS #2 that when got something he would call him. To date, Williams has not called CS #2 back. Based upon their training and experience and the investigation to date, case agents believe Williams and Moody are currently out of supply of cocaine and cocaine base and are planning to re-up their supply of cocaine, which may include traveling to California to meet with their source of supply.

64.     Case agents examined the location data from the **Target Phone** for the past 45 days, which revealed frequent stops in the area of 32nd and Clybourn, 5th and Hadley, 20th and Burleigh and 84th &McMyron Street, and 2134 North 18th Street.

65.     Case agents are requesting this warrant authorizing the disclosure of data related to the **Target Phone** for 45 days to further investigate Moody's activities, and to identify additional locations to which Moody is traveling in order to further his drug distribution network.

31

66.     Based on the information above, I submit that probable cause exists to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, conspiracy to possess with intent to distribute and distribution of cocaine base in the form of "crack" cocaine, a Schedule II controlled substance, have been committed, are being committed, and will continue to be committed by Charles Williams, Kenneth Roby, Jerry Walker Jr., Marshall Moody, and others. I further submit that probable cause exists to believe that obtaining the location information of **414-499-2560 (Target Phone)** will assist case agents in determining Charles Williams, Kenneth Roby, Jerry Walker Jr., and Marshall Moody's other customers, co-conspirators, sources of supply, and help to identify stash houses.

67.     In my training and experience, I have learned that Sprint Spectrum L.P. is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular

32

telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

68.     Based on my training and experience, I know that Sprint Spectrum L.P. can collect E-911 Phase II data about the location of the **Target Phone**, including by initiating a signal to determine the location of the **Target Phone** on Sprint Spectrum L.P.'s network or with such other reference points as may be reasonably available.

69.     Based on my training and experience, I know that Sprint Spectrum L.P. can collect cell-site data about the **Target Phone**.

## AUTHORIZATION REQUEST

70.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

71.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to

33

destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

72.    I further request that the Court direct Sprint Spectrum L.P. to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint Spectrum L.P. for a time period of 45 days from the date the warrant is signed. I also request that the Court direct Sprint Spectrum L.P. to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint Spectrum L.P.'s services, including by initiating a signal to determine the location of **Target Phone** on Sprint Spectrum L.P.'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint Spectrum L.P. for reasonable expenses incurred in furnishing such facilities or assistance.

34

73.     I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate **Target Phone** outside of daytime hours.

2

## ATTACHMENT A

### Property to Be Searched

1.   The cellular telephone assigned call number **414-499-2560** ("**Target Phone**"), whose wireless service provider is Sprint Spectrum L.P., a company headquartered at Overland Park, Kansas.

2.   Information about the location of the **Target Phone** that is within the possession, custody, or control of Sprint Spectrum L.P.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Phone** described in Attachment A for a period of forty-five (45) days from the date the warrant is signed, during all times of day and night. "Information about the location of the **Target Phone**" include all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint Spectrum L.P., Sprint Spectrum L.P. is required to disclose the Location Information to the government. In addition, Sprint Spectrum L.P. must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint Spectrum L.P.'s services, including by initiating a signal to determine the location of the **Target Phone** on Sprint Spectrum L.P.'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint Spectrum L.P. for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

2